LUCCHESI v KENT COUNTY ROAD COMMISSION

Docket No. 48790. Submitted May 8, 1981, at Grand Rapids.—Decided September 9, 1981. Leave to appeal applied for.

Jack Lucchesi, Sr., as administrator of the estate of Jack Lucchesi, Jr., deceased, brought an action against the Kent County Road Commission for the wrongful death of Jack Lucchesi, Jr. Following trial, the jury returned a verdict for the plaintiff. Judgment was entered, Kent Circuit Court, John T. Letts, J., and the defendant appeals. *Held:*

1. The defendant's maintenance of gravel mining and storage operations are not functions *sui generis* to government and thus are not immune to tort liability.

2. The record reveals that the jury properly returned special verdicts concluding that the defendant was guilty of gross negligence or wilful and wanton misconduct.

3. The trial court properly instructed the jury regarding gross negligence, wilful and wanton misconduct, damages, the theories of the respective parties, and the applicable law.

4. The closing argument of the plaintiff's counsel did not result in prejudice to the defendant resulting in error requiring reversal.

5. The trial court properly denied the defendant's motion for mistrial.

6. The Recreational Trespass Act does not violate the title-object clause of the Michigan Constitution.

Affirmed.

MacKenzie, P.J., dissented in part and concurred in part.

REFERENCES FOR POINTS IN HEADNOTES
[1] 57 Am Jur 2d, Municipal, School, and State Tort Liability & 27 *et seq.*
  Municipal immunity from liability for torts. 60 ALR2d 1198.
[2] 57 Am Jur 2d, Municipal, School, and State Tort Liability § 145.
[3] 62 Am Jur 2d, Premises Liability § 23 *et seq.*
[4] 57 Am Jur 2d, Negligence §§ 99-103.
[5] 73 Am Jur 2d, Statutes §§ 99, 101.
[6] 39 Am Jur 2d, Highways, Streets, and Bridges § 341 *et seq.*
[7] 58 Am Jur 2d, Nuisances § 1.

She would hold that the operation of a gravel stockpile in support of maintaining a county-wide road system constitutes a function *sui generis* to government and is subject to governmental immunity from tort liability. In addition, she would hold that the record reveals that the plaintiff's pleadings and proofs were sufficient to place the question of intentional nuisance before the jury. She would reverse and remand.

OPINION OF THE COURT

1. GOVERNMENTAL IMMUNITY — GOVERNMENTAL FUNCTION — STATUTES.

A governmental agency is immune from tort liability in all cases where it is engaged in the exercise or discharge of a function which is *sui generis* to government (MCL 691.1407; MSA 3.996[107]).

2. GOVERNMENTAL IMMUNITY — MINING — STATUTES.

The maintenance of a gravel mining and storage operation by a governmental agency is not a function *sui generis* to government and not subject to governmental immunity from tort liability (MCL 691.1407; MSA 3.996[107]).

3. TORTS — PLEADING — REAL PROPERTY — RECREATIONAL TRESPASS — STATUTES.

A plaintiff in an action for injuries received while engaged in the recreational use of the lands of another must plead and prove gross negligence or wilful and wanton misconduct of the owner, tenant, or lessee to prevail (MCL 300.201, 317.176; MSA 13.1485, 13.1482[6]).

4. NEGLIGENCE — GROSS NEGLIGENCE — WILFUL AND WANTON MISCONDUCT — COMMON LAW.

Gross negligence and wilful and wanton misconduct are distinct concepts at common law and are not synonymous.

5. STATUTES — CONSTITUTIONAL LAW — RECREATIONAL TRESPASS ACT.

The Recreational Trespass Act does not violate the title-object clause of the Michigan Constitution (Const 1963, art 4, § 24, MCL 317.176; MSA 13.1482[6]).

CONCURRENCE IN PART AND DISSENT IN PART BY MACKENZIE, P.J.

6. GOVERNMENTAL IMMUNITY — HIGHWAYS — STATUTES.

*The maintenance of a county-wide road system, including support installations such as gravel stockpiles, is a function* sui generis *to government and is subject to immunity from tort liability*

*except where such immunity is waived specifically by statute (MCL 691.1402, 691.1407; MSA 3.996[102], 3.996[107]).*

7. NUISANCE — NUISANCE IN FACT — INTENTIONAL NUISANCE IN FACT.
 *A nuisance in fact is an act, occupation, or structure which becomes a nuisance because of circumstances and surroundings; an intentional nuisance in fact is one which is created or caused with full knowledge that harm to someone's interests is substantially certain to follow; the determination of under which category a particular nuisance falls is for the trier of fact.*

*Cholette, Perkins & Buchanan* (by *John C. Buchanan, Robert J. Riley* and *Michael F. Kelly*), for plaintiff.

*Smith, Haughey, Rice & Roegge* (by *Lance R. Mather*), for defendant.

Before: MacKENZIE, P.J., and R. B. BURNS and J. N. O'BRIEN,* JJ.

J. N. O'BRIEN, J. Following trial, plaintiff was awarded $170,000 by a jury for the wrongful death of his son in an automobile accident. Defendant, Kent County Road Commission, appeals by right, and plaintiff brings a cross-appeal.

The defendant owns and operates a gravel pit in eastern Kent County near Lowell, Michigan, adjacent to a public park. The gravel pit in question is one of several located in District 5, in the eastern part of Kent County. Over the years, defendant has acquiesced in public use of this site for many recreational purposes, chiefly involving motor sports such as off-road vehicles, dune buggies, motorcycles, and the like. It is not contested that the property in question was not fenced, posted, or otherwise noted to be private property closed to the public. The premises were open to the public

_____
* Circuit judge, sitting on the Court of Appeals by assignment.

day and night, and the single use restriction was a sign that firearms were not permitted.

Commencing several years prior to the accident in which plaintiff's decedent was killed, defendant stockpiled processed gravel in large mounds. The processed gravel was used, as needed, to build and repair roads. The terrain of the gravel pit was uneven, rolling, and studded with tree stumps, boulders, and other hazards. Photographic and testimonial evidence adduced at trial established that a system of fairly well-defined roads, tracks, and trails were present, apparent to even casual observation.

Commencing in late October, 1977, defendant began earth moving operations on one mound and, over succeeding weeks, took out nearly 1,800 cubic yards of aggregate material. The material was removed from one side of the mound, leaving a crescent-shaped ring of material with a precipitous escarpment at its rear. During the course of removal, defendant's agents and employees, truck operators, and scoop-loader operators came to realize the obvious danger created by the project. A driver coming into the gravel pit area, day or night, along well-defined trails leading to the top of the mound of dirt, from west to east, could not see that the entire back of the hill had been removed until he was at the top of a twenty-foot precipice.

In the early morning hours of November 19, 1977, plaintiff's decedent drove a Jeep C-J5, four-wheel drive vehicle off the precipice. He was killed, as were three others riding in the vehicle with him.

Defendant's appeal raises several issues.

First, defendant alleges that it is statutorily immune from suit. MCL 691.1407; MSA 3.996(107).

The well-presented argument of counsel and the narrow holdings of our Court and the Michigan Supreme Court in this subject matter have led us to examine closely the case before us. We conclude that, on the basis of the decisions in *Parker v City of Highland Park,* 404 Mich 183; 273 NW2d 413 (1978), and *Perry v Kalamazoo State Hospital,* 404 Mich 205; 273 NW2d 421 (1978), the maintenance of defendant's gravel mining and storage operations do not enjoy statutory governmental immunity.

Given the standard imposed by *Perry* and *Parker,* that government is immune from suit only where it is engaged in those functions which are *sui generis* to government, we are not persuaded that the maintenance of a gravel pit, or even construction and maintenance of roads within a county road network, is a uniquely governmental activity.

Next, defendant raises a number of complex issues surrounding the plaintiff's claim, proofs adduced at trial, and the instruction of the court concerning gross negligence or wilful and wanton misconduct.

Our review of the record leads us to affirm the special jury verdicts entered in this case concluding that defendant was guilty of gross negligence or wilful and wanton misconduct. Moreover, defendant's reliance on *Thone v Nicholson,* 84 Mich App 538; 269 NW2d 665 (1978), is misplaced. The active conduct of defendant in creating an obvious danger is directly opposite the defendant's conduct in *Thone.* Moreover, this defendant had both notice of the seriousness of the danger and the means and opportunity to prevent disaster immediately after creating the hazard.

Initially, we reject the application of *Zeni v*

*Anderson,* 397 Mich 117, 146-151; 243 NW2d 270 (1976), and 2 Restatement Torts, 2d, §§ 479 and 480 to this case. Obviously, *Zeni* and these Restatement sections apply only to situations where a defendant knows, or has reason to know, of a plaintiff's helplessness and could, but for his or her own negligence, avoid injury to a plaintiff.

We note that the trial court properly ruled that the statutes applicable here, MCL 300.201; MSA 13.1485 and MCL 317.176; MSA 13.1482(6), required that the plaintiff plead and prove gross negligence or wilful and wanton misconduct in order to prevail. *Thone, supra.*

The unfortunate use of gross negligence and wilful and wanton misconduct as synonyms over the years have created a body of law and precedent which has serious implications for the bench and bar. We agree with the reasoning of Judge R. B. BURNS in *Thone, supra,* that there is most certainly a difference between gross negligence and wilful and wanton misconduct and that failure to maintain a distinction blurs the separate concepts and contributes to unnecessary confusion over the various meanings of gross negligence and wilful and wanton misconduct. *Gibbard v Cursan,* 225 Mich 311; 196 NW 398 (1923), *LaCroix v Grand Trunk W R Co,* 379 Mich 417; 152 NW2d 656 (1967). Moreover, we agree that cases which have interpreted the trespass and recreational land use statutes, with the exception of *Thone,* have failed to see or apply the different standards of conduct properly. See *Magerowski v Standard Oil Co,* 274 F Supp 246 (WD Mich, 1967), *Taylor v Mathews,* 40 Mich App 74; 198 NW2d 843 (1972), *Thomas v Consumers Power Co,* 394 Mich 459; 231 NW2d 653 (1975). However, we are bound by the rationale and law of *Thomas* and hold that a jury-

submissible issue was pled and proved by plaintiff
so as to avoid either a defense motion for summary judgment or a directed verdict.

The testimony of defendant's truck drivers and
equipment operators and that of the experienced
police officer who investigated the accident convince us that the plaintiff has proved his case by a
preponderance of the evidence.[1] Defendant had

---

[1] Concerning plaintiff's claim of gross negligence or wilful and
wanton misconduct, a number of witnesses testified concerning the
condition at the defendant's gravel pit.

TESTIMONY OF GREGG PHILLIPS

"Q. [By Mr. Buchanan, plaintiff's attorney]: Mr. Phillips, were you
among the truck drivers that were involved in the removal of that
gravel for a couple of days in late October of 1977?

"A. Yes.

"Q. And isn't it true, based upon your recollection, you guys took
away about a half of that pile?

"A. Yes.

"Q. And isn't it true, that before you went out there and took away
that pile which we could see in that picture, before you did that, that
there was a nice, big plateau up on top where vehicles could drive up,
stop, turn around and come back down?

"A. Possibly. It wasn't too big but I think they could.

"Q. Well, you took away about half the stack, didn't you?

"A. Half the top gone.

"Q. And you do know that if you personally went out there with
your recreational vehicle—you said no qualms, you would have gone
out there if you wanted to, wouldn't you?

"A. Yes.

"Q. And you personally know there was some sort of plateau up
there that vehicles could drive up on and turn around and come back
down?

"A. Yes.

*  *  *

"Q. Now, there was something mentioned about 'noon'. Can you tell
us, sir, was there a conversation with yourself and other truck drivers
some noon when you guys were starting to chop away from that hill
leaving that hill like that, that so-called 'obvious danger' you talked
about, was there a conversation like that?

"A. Yes.

"Q. Can you tell us, sir, about that conversation you and the other
truck drivers had?

"A. Well, I don't recall the one of us that said it. It might have
been me.

"Q. What did you say?

"A. We said—I said to somebody—called him some name—some

clown was going to come up this hill and go right off the top and be really surprised, and the reason I called him a name like I said, they would be kind of goofy or something because it wouldn't be me. I would always check the other side of the hill.

"*Q.* I see. When you guys were talking about the obvious danger, you and a number of other truck drivers were standing around and kind of observing what we see in this picture right here. Let's take a look at it. What you are talking about is that you could see, in that picture, there is no way you can tell that hill's been removed?

"*A.* No, sir.

"*Q.* That is correct, isn't it?

"*A.* Yes, correct.

"*Q.* And as you move up closer on it, as you see in that picture, there is still no way you are going to tell that hill's been removed?

"*A.* No, sir.

"*Q.* But all of a sudden from profile you can tell there is a nice, sharp drop for somebody and what you are saying is that you and the other truck drivers recognized that—you could call him a clown, you could call him anything you want to call him—somebody that's used to coming out there and perhaps didn't because the jeep was down for a couple of weeks comes right over and does not know that hill has been excavated, right, sir?

"*A.* Yes.

"*Q.* And you had that conversation with you and several of your truck drivers sometime before this accident happened, didn't you?

"*A.* Yes.

"*Q.* And you talked about that so-called 'obvious danger' and what could happen to some human being?

"*A.* Yes. We weren't really talking about going all the way over, just if you came up to stop on top you would be surprised.

"*Q.* Well, when you had that conversation there were several of you guys out there talking about it, weren't there?

"*A.* Yes."

TESTIMONY OF ED FALK

"*Q. [By Mr. Kelly, plaintiff's attorney]:* In fact, Mr. Falk, you told us in your deposition and you gave an estimate, anyway, that you had taken away 30 to 40 feet from that hill, isn't that correct?

"*A.* That's my estimate.

"*Q.* And you also told us that you were having coffee one morning or you were having lunch, you weren't quite sure, but there was a conversation that took place between the various drivers and possibly the loader operator?

"*A.* Yes, sir.

"*Q.* Do you recall telling me about that conversation?

"*A.* Well, there was just statements made that if somebody ever went flying off there they would go a hell of a long ways.

"*Q.* Do you recall telling me in the deposition that as you were looking at the hill—the profile of the hill that you or some of the drivers said it would really be a bitch if somebody went over on top of that hill?

"A. Yes, sir.

"Q. And that's what they said, right?

"A. Yes, sir.

* * *

"Q. But from going in and out of that pit that day from that truck you could still see there were tracks leading right up the hill from the west side, couldn't you?

"A. That's a view you would have coming into the pit.

"Q. And that was undisturbed in any way, wasn't it?

"A. No, it hadn't been dug on that side of the hill.

"Q. There was no digging or warning signs put up that something had happened on the east side?

"A. No, sir.

"Q. From your familiarity you knew that if someone was coming into that pit, particularly from the Lowell area, they would come from that same little trail?

"A. Yes.

"Q. And they would be approaching from the west?

"A. Yes.

"Q. And there is no way they would know what happened on the east side?

"A. Not unless they had driven past and saw the east side.

"Q. But particularly if they came through there at night?

"A. True.

"Q. And you knew from your past experiences out there at that gravel pit that people did go out there at night?

"A. Yes.

"Q. And you could see, even when you were working for that road commission hauling that gravel out, that they were still coming out at night because you could see beer cans and things of this nature?

"A. Yes.

"Q. You knew people went out there and parked?

"A. Yes.

"Q. So as you and your fellow drivers were looking at that hill you recognized that there was an obvious danger, didn't you?

"A. Yes, there was tracks going up to the top, yes.

"Q. You recognized that somebody that was familiar with that area and used to driving up that west side did not know that the east side had been taken away that they would go right off the east side?

"A. Yes.

"Q. And you recognized that they could be seriously hurt?

"A. Yes.

"Q. Or possibly killed?

"A. Yes."

TESTIMONY OF DONALD EICKHOFF

"Q. [By Mr. Buchanan]: And when you were there, Mr. Eickhoff, did you assist in the getting of that wreckage, assist in the getting of the

victims of the accident into the ambulance and that that sort of thing, sir?

"A. Yes.

"Q. Mr. Eickhoff, you're there, you said, because at this particular time you were a wrecker driver and you were not really there as an official of the county road commission, were you, on the day of the accident?

"A. No, I wasn't there because of the road commission, I was there because of my own business.

"Q. Because of your wrecker business?

"A. That's right.

"Q. But just by coincidence, you happened to be an employee of the road commission and also the man who would normally have been the one to operate the loader, who works out at that hill; is that correct, sir?

"A. Yes.

*  *  *

"Q. All right. Mr. Eickhoff, when you got out there and you looked at this particular situation, as you told me in the deposition, you had an opportunity to take a walk around and to look at that hill from the west side, did you not, sir?

"A. Yes, I did.

"Q. And you could see from the west side of that hill that anybody who happened to be used to coming in there with their recreational vehicles separate, they would not—they would not be able to see what had happened on the other side of the hill; isn't that correct, sir?

"A. Yes, I did.

"Q. And even in broad daylight, if you happened to move a little closer to that hill, as we see in this picture, you could see even at that time that it would be no way to tell what had been left just over the crest; isn't that correct sir?

"A. That's right.

"Q. And you saw that at that time, didn't you? You observed that? You looked around, walked around, you looked at it, didn't you, sir? Mr. Eickhoff?

"A. Yes.

"Q. And when you observed that, you as a loader operator also observed that whoever was there and did this did not take their loader up to the front of that hill and remove any of that gravel from right along in here, did they, sir?

"A. No, they didn't.

"Q. Now, Mr. Eickhoff, you as a loader operator and being familiar, sir, with safe, proper operation and having worked for fifteen years in that capacity, you were familiar with the proper and safe operation of that type of equipment, weren't you, sir?

"A. Yes.

"Q. And you were familiar with the way in which a hill or excavation or whatever ought to be left, weren't you, sir?

"A. Yes.

"Q. And based upon your experience, the fifteen years you've

worked in that job, based upon your knowledge and common sense
and good judgment, based upon what you understood to be a policy of
the government relative to how they're supposed to leave that sort of
thing, could you tell us what—how this was left, from your observa-
tion as compared to the way it should have been left?

"A. Well, it was just—when the loader operator got done, he must
have pulled out instead of going around and scooping up the other
side a little bit, just to slow somebody down, because you can't keep
'em out, but it would slow 'em down from going like the devil, going
up the hill.

"Q. It would tell them you'd been there?

"A. Yes.

"Q. And wasn't your reaction when you saw it it was terrible?

"A. Yes.

"Q. Isn't that what you told me, sir?

"A. Yes.

"Q. And wasn't your reaction when you saw that that you said that
it would only take about fifteen or twenty minutes of time to take
that machine you've got that can pick up a half a truckload of stuff in
one scoop and go around the front of that hill; isn't that correct, sir?

"A. That's right.

"Q. He could have just come right around there, and like he'd made
in the backside of the hill, he didn't have to make it as high, but as
we can see from the backside of the hill, right here, those big
teethmarks, those scoop marks are made by that equipment of yours;
isn't that correct, sir? We see right in there?

"A. Not my machine.

"Q. No, not—I don't mean your machine, I know you weren't the
one that did this and left it this way, but I'm saying the scoop marks
that we see at the base of that hill is the sort of thing that your
machine would be able to do; is that correct, sir?

"A. Yes.

"Q. And you're able with that machine to pick up with two scoops a
truckload of that gravel, and you're able to create what you call those
scoop marks, or is there a name for that?

"A. No.

"Q. All right. You're able to pick it up and scoop it out; isn't that
correct?

"A. That's right.

"Q. And you're able to create an embankment of some sort, as Mr.
Haughey was talking about the reason they couldn't go down on the
east side is that they had scooped that out, because there was no
access on the east side of the hill; isn't that correct, sir?

"A. Yes.

"Q. And what you could do, you could go to the other side of that
hill, which you said they should have done, right here, and they could
take—that's those scoop marks right there, and they could take out
and make, not necessarily that big, but they could at least take out
some scoop marks and create a wall like that; isn't that correct, sir?

"A. Yes.

"*Q.* And that would certainly make it awfully difficult for anybody to come up there; isn't that correct, sir?

"*A.* That's right.

"*Q.* And when you observed that, you thought, you felt that whoever did the work for the road commission on this job didn't do it the way they should have done it based upon safe operating practice; isn't that correct, sir?

"*A.* Yes.

"*Q.* And if you had done this job and if it—if fortune had been such that you weren't sick that day or whatever, you'd have done it; is that correct, sir?

"*A.* Yes.

"*Q.* You'd have done it because it was common sense?

"*A.* Yes.

"*Q.* And common decency, if you respect human life; isn't that correct, sir? Correct, sir?

"*A.* I'd say yes.

"*Q.* And because it was the required policy of the government that you don't leave it that way; isn't that correct, sir?

"*A.* Yes."

TESTIMONY OF RAY FUGITT

"*Q.* [*Mr. Buchanan, plaintiff's attorney*]: Now, Mr. Fugitt, you were among the truck drivers who was out there and took away the back side of that hill a couple weeks or so before this accident, isn't that correct, sir?

"*A.* Yes, sir.

"*Q.* And when you guys were removing the back side of that hill like we just talked about and taken it away, you could see that that guy who happened to bring his family over there and have a picnic and the kid with the mini-bike or four-wheel drive vehicle—you guys could see what happened to that fellow, couldn't you?

"*A.* Yes.

"*Q.* And you talked about it, didn't you?

"*A.* Yes, sir, I believe we did.

"*Q.* And there were several of you that stood around and had that conversation, isn't that right?

"*A.* That's correct.

"*Q.* As a matter of fact, I don't know if it was during a lunch break or coffee break or what it was, but you were standing there and you could see just what we could see and we talked about a moment ago, isn't that correct?

"*A.* That's correct.

"*Q.* And you could see this particular gravel pit, unlike all the other gravel pits in the district—well, this one didn't have any fences. You could see that?

"*A.* That's correct.

"*Q.* It had no sign that would tell people they shouldn't be there. You could see that?

"*A.* Yes, sir.

"*Q.* You guys knew and it was common knowledge that people came in there with their recreational vehicles on almost a daily basis, didn't you?

"*A.* Yes, sir.

"*Q.* And they came and could go to the top of this hill and perhaps look at the animals or whatever and that was common knowledge, wasn't it?

"*A.* Yes, it was.

"*Q.* And as you took away the back side of the hill and you could see where someone comes up that hill on the west side just like we talked about that little kid—they can just ride on over and be all gone or seriously injured, couldn't they?

"*A.* Yes, sir.

"*Q.* And you guys felt that was a very serious danger, didn't you?

"*A.* Yes, sir.

"*Q.* And you talked about it?

"*A.* Yes, sir.

"*Q.* Because people had come there, they had regarded it as part of the park and thought it was part of the park and a real hazard existed for them, isn't that right?

"*A.* Yes, sir.

"*Q.* And you felt that the people in charge should definitely have done or should have taken some action to prevent that type of tragedy, didn't you?

"*A.* Correct.

"*Q.* And you all had that conversation, didn't you?

"*A.* Several, sir, I don't recall how many."

TESTIMONY OF LIEUTENANT WALTER HUDENKO, KENT COUNTY SHERIFF DEPARTMENT

"*Q.* [*By Mr. Buchanan*]: Officer Hudenko, based upon what you observed at the scene of the accident, looking at that hill from the west as a driver would see it on that day, and I want you to assume that a driver did not know that the east side of the hill or that top had been taken away, whether it be day or night, and he proceeded up the hill. Would there be any way to know that the top had been gone if you came up the west side and he didn't know it beforehand?

\* \* \*

"*A.* I would say no.

"*Q.* Based upon what you saw that day, as you look at the hill from the west, would that or would that not be the direction from which a vehicle would enter the area?

"*A.* One of the areas.

"*Q.* Well, I mean to get access to that recreational vehicle site, or the gravel pit; would the logical entrance way be that road that we see in Exhibit #1, where that sign says No Firearms Allowed?

"*A.* Yes.

"*Q.* And if a vehicle entered that, even in broad daylight, and proceeded toward the mound and then proceeded up the mound, would there be any way a driver coming up that mound, based upon

knowledge of a situation requiring the exercise of ordinary care and diligence to avoid injury to the plaintiff's decedent and the public. Further, defendant had, and knew it had, the ability easily to avoid the resulting harm by the exercise of ordinary care and prudence using no extraordinary measures. Finally, defendant knew that its conduct created the all too apparent threat of disaster, yet failed to use ordinary care to avoid the danger.

Defendant's argument that "nothing could have

---

what you saw that day, would be able to see what would lay immediately at the top of that drop-off?

"*A.* Are you excluding the possibility he might go around and look?

"*Q.* That is exactly—I am assuming that in broad daylight we have four people coming in, and just so we don't have any claim these four people had anything to drink, we have four people, apparently sober people, coming in there in broad daylight and driving right up the west side, driving right up that so-called road, and the west side of the mound. I want you to assume that, and tell me, would there be any way they could see what lay just over the top of the hill until they got to the top?

"*A.* Are we considering a speed factor?

"*Q.* We are saying a car or a vehicle, or a four-wheel drive or whatever, is coming up this, and based upon—whatever speed, unless he is crawling, but going 8 or 10 or 12 miles an hour, would there be any way he could see it in time to stop?

"*A.* There again, eliminating speed factor, he would not know until he reached the very top.

"*Q.* And you could see that—you could observe and that was part of your investigation the day of the accident?

"*A.* Yes, sir.

"*Q.* So the fact that this thing happened at night, could, based upon what you saw, could also have happened in the daylgiht, because of the visibility obstruction?

"*A.* I would say so.

"*Q.* And whether or not somebody was drinking or not drinking, it could happen to somebody who was perfectly sober, couldn't it?

"*A.* It is feasible.

"*Q.* Did you find, in your investigation, that the county made any effort whatsoever to warn or advise the users of that area, for recreational vehicles, that they had taken the top away from the hill?

"*A.* I saw no indication there that any dirt had been removed.

"*Q.* Or any effort had been made to warn, is that correct?

"*A.* No signs or any warnings."

been done" falls on deaf ears. Defendant had an absolute duty under these circumstances to obviate the danger. To have done nothing was not only grossly negligent, but wilful and wanton inaction. Having baited a trap for even the most prudent driver, defendant could not stand by idly and await a victim.

We recognize that the three-part test which the Supreme Court said was misleading in *Zeni* and which is questioned in *Thone* is misleading if applied to the situations faced by the Court in those two cases, but we have no doubt that the test and 2 Restatement Torts, 2d, §§ 342 and 343, apply here. Further, we hold that even if it does not, the facts adduced at trial go so far as to show not only gross negligence, by whatever standard, but the reckless want of care so as to put the defendant "in the class with the wilful doer of wrong". *Gibbard, supra, LaCroix, supra,* 425-426.

The trial court's instruction to the jury on gross negligence and wilful and wanton misconduct as well as its instructions on damages, read as a whole, adequately and fairly set forth the parties' respective theories of the case and the applicable law. We find no error.

Moreover, defendant suffered no prejudice as a result of plaintiff's counsel's closing argument, nor was there error in the trial court's ruling on defendant's mistrial motion.

Finally, we hold that the Recreational Trespass Act, 1976 PA 323, MCL 317.176; MSA 13.1482(6), is constitutional. Its object, the regulation of trespass, is embodied in the title of the act. Const 1963, art 4, § 24. Moreover, the statute applies in all cases to governmental entities where the plaintiff pleads negligence as a cause of action.

Affirmed.

R. B. BURNS, J., concurred.

MACKENZIE, P.J. *(dissenting in part, concurring in part).* I respectfully dissent from the majority's disposition of the governmental immunity issue. I concur with the majority's disposition of the other issues raised by defendant.

MCL 691.1407; MSA 3.996(107) provides:

"Except as in this act otherwise provided, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided herein, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed heretofore, which immunity is affirmed."

A governmental agency is "engaged in the exercise or discharge of a governmental function" when it is engaged in activities that are *"sui generis* governmental—of essence to governing". See *Parker v City of Highland Park,* 404 Mich 183, 193, 199; 273 NW2d 413 (1978). A county, through its board of county road commissioners, is required by statute to keep all roads, bridges, and culverts within its jurisdiction and under its care and control in reasonable repair. MCL 224.21; MSA 9.121. While roads may occasionally be constructed by private entities, maintenance of a county-wide system of roads is an activity of such magnitude and public importance that it can only be effectively carried out by the government. Such an activity is, therefore, "of essence to governing". Compare *Davis v Detroit,* 98 Mich App 705; 296 NW2d 341 (1980).

By MCL 691.1402; MSA 3.996(102), the Legislature waived the immunity which would otherwise

arise under MCL 691.1407; MSA 3.996(107) in certain situations:

"Each governmental agency having jurisdiction over any highway shall maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel. Any person sustaining bodily injury or damage to his property by reason of failure of any governmental agency to keep any highway under its jurisdiction in reasonable repair, and in condition reasonably safe and fit for travel, may recover the damages suffered by him from such governmental agency. The liability, procedure and remedy as to county roads under the jurisdiction of a county road commission shall be as provided in section 21, chapter 4 of Act No. 283 of the Public Acts of 1909, as amended, being section 224.21 of the Compiled Laws of 1948. *The duty of the state and the county road commissions to repair and maintain highways, and the liability therefor, shall extend only to the improved portion of the highway designed for vehicular travel and shall not include sidewalks, crosswalks or any other installation outside of the improved portion of the highway designed for vehicular travel.* No action shall be brought against the state under this section except for injury or loss suffered on or after July 1, 1965. Any judgment against the state based on a claim arising under this section from acts or omissions of the state highway department shall be payable only from restricted funds appropriated to the state highway department or funds provided by its insurer." (Emphasis added.)

Note that under the emphasized language the immunity of a county road commission, such as defendant here, is not waived for installations which are not part of the improved portion of a highway but which are nevertheless part of maintaining a county-wide system of roads.

Plaintiff would have us hold that the maintenance of the gravel pit here was not sufficiently related to the maintenance of a county-wide sys-

tem of roads to be regarded as part of the latter activity. However, the undisputed testimony indicated that all quarrying of gravel had ceased several years previously. At the time the accident took place, the quarry was merely the site of defendant's stockpile of gravel for use according to the requirements of future construction or maintenance. Roads cannot be maintained in a vacuum; the county road commission must create, equip, and supply an organization for that purpose. I would hold that the gravel stockpile here was a necessary support installation for the activity of maintaining a county-wide system of roads and thus part of an activity "of essence to governing".

My resolution of the foregoing issue requires me to address an issue which the majority does not reach. Plaintiff has cross-appealed and argues that the trial court erred by declining to place the question of intentionally created nuisance in fact before the jury. The judicially created nuisance exception to governmental immunity was reexamined by the Supreme Court in *Rosario v City of Lansing,* 403 Mich 124; 268 NW2d 230 (1978), and *Gerzeski v Dep't of State Highways,* 403 Mich 149; 268 NW2d 525 (1978). Although no majority emerged in those cases, it is clear that at least five justices agreed that an exception existed for intentionally created nuisances in fact. *Ford v Detroit,* 91 Mich App 333; 283 NW2d 739 (1979). A nuisance in fact is an act, occupation, or structure which becomes a nuisance because of circumstances and surroundings. Whether a particular thing is a nuisance in fact is a question for the trier of fact. *Id.,* 335-336. An intentional nuisance is intentional only in the sense that defendant created or caused the nuisance with full knowledge that harm to plaintiff's interests was substan-

tially certain to follow. *Rosario, supra,* 143, fn 2. Contrary to defendant's suggestion here, the term "nuisance" is not limited to conditions or activities which threaten injury to persons outside defendant's premises. See *id.,* 139-140, and the cases cited therein. Since my review of the record convinces me that plaintiff's pleadings and proofs were sufficient to place the question of intentional nuisance in fact before the jury, I would reverse and remand for trial on that question.